FILED

2022 Aug-26  AM 11:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EARNEST LEE WALKER, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-00258-ACA-SGC |
| | ) | |
| GWENDOLYN GIVENS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Earnest Lee Walker, Sr., filed a *pro se* complaint under 42 U.S.C. § 1983 for violations of his civil rights. (Doc. 1).[1] After an initial review under 28 U.S.C. § 1915A, only two claims remain: (1) an Eighth Amendment excessive force claim against Sergeant Steven Harrison. (Doc. 11; Doc. 12 at 3-5); and (2) an Eighth Amendment conditions of confinement claim against Alabama Department of Corrections ("ADOC") Commissioner Jefferson Dunn and W.E. Donaldson Correctional Facility ("Donaldson") Wardens Gwendolyn Givens and Kenneth Peters.

The defendants filed a special report, which the court construed as a motion for summary judgment. (Docs. 23, 24). That motion is before the undersigned

---

[1] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

magistrate judge for a preliminary report and recommendation. *See* 28 U.S.C. § 636(b)(1); *McCarthy v. Bronson*, 500 U.S. 136 (1991). For the reasons to follow, the undersigned recommends the court grant the defendants' motion for summary judgment.

## I.    Procedural History

Walker filed his complaint in February 2020. (Doc. 1). On October 8, 2021, after its initial review, the court entered an Order for Special Report directing the Clerk to forward copies of the complaint to each of the named defendants and directing the defendants to file a special report addressing the plaintiff's two remaining claims. (Doc. 12). The order advised Walker he would have 21 days after he received the special report to file his initial disclosures pursuant to Federal Rule of Civil Procedure Rule 26(a)(1).

On February 7, 2022, the defendants filed a special report, supplemented with affidavits and other documents. (Doc. 23). On February 8, 2022, the court construed the special report as a motion for summary judgment and notified Walker he had 21 days to respond to the motion for summary judgment by filing affidavits or other evidence. (Doc. 24). The court also advised Walker of the consequences of any default or failure to comply with Rule 56. (Doc. 24); *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). The defendants supplemented their Special Report on February 17, 2022. (Doc. 27).

After receiving multiple extensions, Walker filed his response on June 16, 2022. (Doc. 35). He did not submit initial disclosures. This matter is now before the court on the defendants' motion for summary judgment.

## II.    Standard of Review

Because the court has construed the defendants' special report as a motion for summary judgment, Federal Rule of Civil Procedure 56 governs the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In making that assessment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences against the moving party. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000). The moving party has the initial burden of showing there are no genuine issues of material fact and he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The plaintiff has the ultimate burden of proving his claims, so the moving party will be entitled to judgment as a matter of law on any claim unless the plaintiff is able to show some evidence supporting each element of that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. In such a situation, there can be no genuine

issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations and internal quotations omitted).

In determining whether to grant summary judgment, however, the court will consider any "specific facts" pled in a *pro se* plaintiff's sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than a pleading drafted by a lawyer. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980).

## III.   Summary Judgment Facts

Walker seeks monetary and injunctive relief for his Eight Amendment excessive force and conditions of confinement claims. (Doc. 1 at 5, 26). When the events alleged in his complaint took place, Walker was a state prisoner incarcerated at Donaldson. (Doc. 1 at 2). In January 2022, Walker notified the court he had been transferred to G.K. Fountain Correctional Facility. (Doc. 22).

### A.   Excessive Force Claim

Walker's excessive force claim arises from an incident in which his hand was closed in a door during an announced lock down. On April 29, 2019, Sergeant A.

Edmonds and Sergeant Harrison were escorting at least one inmate through the East Hall.[2] (Doc. 35 at 4). At that time, Walker was standing in the law library in the East Hall talking with another inmate, and his right hand was on the door frame. (Doc. 1 at 15; Doc. 35 at 7, 9). Edmonds announced the East Hall was locked down but did not secure the library door. (Doc. 1 at 15).

As Harrison walked past the library door, he closed the door on Walker's hand. (Doc. 1 at 15). Harrison says he gradually closed the door to the library after ordering Walker to move out of the doorway, which Walker did not do; however, Walker insists Harrison closed the door without any specific warning or verbal order. (Doc. 23-4; Doc. 35 at 7).

Walker pushed the door off his hand and notified both Edmonds and Harrison that Harrison closed the door on his hand. (Doc. 1 at 15; Doc. 23-4; Doc. 35 at 7). Edmonds escorted Walker to the infirmary, where Harrison admitted he closed the door on Walker's hand. (Doc. 1 at 15; Doc. 23-4; Doc. 35 at 7). Walker was examined and treated for swelling and discoloration to his nail. (Doc. 23-9 at 75). He reported throbbing and a 9/10 pain level. (Doc. 23-9 at 75). The examiner noted

---

[2] The parties dispute who was being moved through the East Hall and from where, but this dispute is irrelevant to Walker's excessive force claim. Walker asks the court to disregard Harrison's affidavit in its entirety because of this discrepancy; however, the court does not make credibility determinations in evaluating a motion for summary judgment, and it instead accepts Walker's version of events as true where there is a conflict. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

a good pulse with no loss of sensation. (Doc. 23-9 at 75). Walker was prescribed acetaminophen for pain, and an x-ray was ordered. (Doc. 23-9 at 75). Walker was released back to general population but was to be treated daily for wound care and a circulation check for the following seven days. (Doc. 23-9 at 74). Two days later, an x-ray revealed a fracture of the distal tuft of the distal phalanx of the small finger (the tip of his pinky finger). (Doc. 23-9 at 72). Walker's medical records reflect no further treatment for this injury. (Doc. 23-9).

On April 30, 2019, Walker reported the incident to then Warden Christopher Gordy. (Doc. 35 at 12). He reported Harrison closed the library door on his hand without any warning and requested an incident report be completed so he could submit a claim to the Board of Adjustment. (Doc. 35 at 12). The record does not reflect whether Walker ever submitted that claim.

### B.    Conditions of Confinement Claim

Walker complains that Donaldson is overcrowded, is "in an exceptional state of disrepair," and requires major improvements. (Doc. 1 at 5, 16). Walker's complaints regarding the condition of Donaldson can be generally characterized as follows: overcrowding and staffing shortages, excessive heat and lack of ventilation, pests and rodents, lack of recreation, and general disrepair and uncleanliness.

### 1.    Overcrowding and Staffing Shortages

Walker contends overcrowding at Donaldson is the chief problem. (Doc. 1 at 24). Donaldson suffers from staffing shortages, and a single officer is often responsible for supervising anywhere from 96 to 130 inmates. (Doc. 1 at 21). Officers are required to work excessive overtime, which Walker believes affects their ability to remain alert, and officers often sleep on duty. (Doc. 1 at 22). Additionally, security cameras are scarce, officers cannot see certain areas from their stations, and Donaldson lacks an emergency communication system. (Doc. 1 at 18, 22). Further, prison officials ignore inmates' complaints they are fearful of assault, causing those inmates to "resort to their own devices to protect themselves." (Doc. 1 at 22). Walker contends he is exposed daily to a substantial risk of harm due to overcrowding and staffing deficiencies. (Doc. 1 at 25-26).

According to Warden Givens, although Donaldson's original capacity was 716 inmates, it is currently designed to house approximately 1500 inmates and, as of January 24, 2022, houses 1448 inmates. (Doc. 23-1 at 4). Givens acknowledges Donaldson's staffing challenges but contends recruitment and hiring is an ADOC priority. (Doc. 23-1 at 4). According to Warden Peters, a new camera system was installed in 2021. (Doc. 23-3 at 3).

### 2.      Excessive Heat and Lack of Ventilation

Walker complains fans and heaters in many of the dorms and gyms are covered in dust and debris that prevent them from functioning properly. (Doc. 1 at 18, 20). Dorms have poor ventilation, and the Special Housing Unit ("SHU") does not have proper ventilation, heat, or air. (Doc. 1 at 17, 20). The heat in the summer is intolerable. (Doc. 1 at 20-21). The blocks lack water fountains and ice machines. (Doc. 1 at 17-18).

Givens agrees that fans and heaters were covered with dust and not functioning properly, but maintenance is called when the equipment breaks down. (Doc. 23-1 at 3). If building maintenance cannot repair the machines because they lack the supplies or equipment to do so, Givens contacts ADOC's Engineering Division for further instructions or to request a quote for repair or replacement of the affected equipment. (Doc. 23-1 at 3). Since August 2021, an inmate has cleaned the fans and vents weekly using a lift. (Doc. 23-1 at 2). Some units in the SHU are equipped with air conditioning, and ventilation and air flow are as good as expected given the age of the building and equipment. (Doc. 23-1 at 3). The mental health units recently had new heating and air equipment installed. (Doc. 23-3 at 2). Ice chests are provided to every dorm, and ice calls are held on each shift. (Doc. 23-3 at 2).

### 3.    Pests and Rodents

Walker claims Donaldson suffers from an infestation of insects and rodents, including in the gym, living area, and kitchen. (Doc. 1 at 17-20). Rainwater sits in the courtyards, attracting insects and rodents. (Doc. 1 at 20). According to Peters, Donaldson contracts with a pest control company that sprays weekly and sets bait traps for rodents. (Doc. 23-3 at 2).

### 4.    Lack of Recreation

Walker complains inmates in the SHU are not regularly provided exercise or outdoor recreation. (Doc. 1 at 21). He also asserts the lack of educational and vocational programs, activities, and exercise contribute to excessive violence at Donaldson. (Doc. 1 at 22). According to Givens, Donaldson's security level limits the activities, exercise, work, and educational and vocational programs offered, but Ingram State Technical College has added an HVAC trade since Givens has been assigned to Donaldson. (Doc. 23-1 at 4).

### 5.    General Uncleanliness and Disrepair

Walker contends Donaldson is "in an exceptional state of disrepair" and requires major improvements. (Doc. 1 at 16). Some units, including living areas, have inadequate or no lighting, and some units lack running water. (Doc. 1 at 17, 18, 21). The ceilings in both gyms are dilapidated, causing debris to fall on inmates. (Doc. 1 at 20). The kitchen is filthy and has standing pools of water, there is dirt in

food preparation and storage areas, and the kitchen drains have collapsed. (Doc. 1 at 19).[3] The toilet near the kitchen is not secured properly, leaks water, and is filthy. (Doc. 1 at 19).

There is no covered walkway or shelter in the East and West hallways to protect inmates from inclement weather. (Doc. 1 at 18-19, 20). Many of the dorms have an inadequate number of showers, and those that are there have mold and fungus. (Doc. 1 at 17-18). The new toilet system has a time-controlled flushing mechanism that "forces the men in the blocks to live in close confines with their own human waste." (Doc. 1 at 17). Sinks, toilets, and showers do not operate properly. (Doc. 1 at 18).

Givens agrees the kitchen has major plumbing, flooring, and equipment issues, and she acknowledges maintenance is a "major concern" given the age of Donaldson, as well as infrastructure issues. (Doc. 23-1 at 2). ADOC's Engineering Division is aware of these issues and is working to assist. (Doc. 23-1 at 3). Cleaning the facility requires help from both security staff and inmates, but inmates do not do their part in keeping living areas and dorms clean. (Docs. 23-1 at 3). They break brooms and mops to use them for weapons and to make tents in the dorms. (Doc.

---

[3] The plaintiff concedes holes in the kitchen floors and ceiling recently were "patched up." (Doc. 1 at 19).

23-1 at 3). They also steal, sell, and destroy cleaning supplies. (Doc. 23-3 at 3). Only 25% of the inmate population will work on an assigned job. (Doc. 23-1 at 5).

Peters disputes that the East and West hallways are outdoors, stating they are indoors and inmates do not stand uncovered outside during inclement weather. (Doc. 23-3 at 2). The sprinkler systems do not leak, and the mental health units have new sprinkler heads and systems. (Doc. 23-3 at 2). All dorms and units have assigned dorm cleaners who clean each day, including dusting fans and other areas. (Doc. 23-3 at 2). Cleaning supplies are provided weekly. (Doc. 23-3 at 2).

Walker cites the 2019 report from the United States Department of Justice regarding its investigation of Alabama's state prisons for men (the "DOJ Report")[4] as evidence of the defendants' knowledge of and deliberate indifference to the conditions at Donaldson. (Doc. 1 at 23). In her affidavit, Givens states she does not object to Walker's citation of the DOJ report. (Doc. 23-1 at 5).

## IV.   Analysis

The defendants ask this court to enter summary judgment in their favor on both of Walker's Eight Amendment claims. First, Harrison argues he is entitled to summary judgment on Walker's excessive force claim because Walker's injured finger is a de minimis injury. He also argues Walker failed to obey a direct order to

---

[4] The undersigned will assume Walker is referencing the well-publicized April 2, 2019 report available at https://www.justice.gov/opa/press-release/file/1150276/download.

leave the doorway during the announced lockdown. Second, Dunn, Peters, and Givens assert they are entitled to summary judgment because Walker has not identified a clearly established right that might form the basis of a conditions of confinement violation, and they are therefore entitled to qualified immunity. They also contend Walker has not demonstrated they had the "means to cure" the conditions and so there is no evidence to support a finding they consciously and culpably refused to prevent any harm to Walker.

### A.   Excessive Force

The Eighth Amendment, which prohibits the infliction of cruel and unusual punishment, governs prison officials' use of force against convicted inmates. *Johnson v. Moody*, 206 F. App'x 880, 883 (11th Cir. 2006). In an excessive force claim, the court considers both an objective and subjective component. *Id.* First, the court considers whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Id.* Second, the court considers whether the prison officials "acted with a sufficiently culpable state of mind." *Id.* (internal quotations omitted). Both the subjective and objective inquiries are contextual, "and the objective harm inquiry is responsive to contemporary standards of decency." *Moore v. Hunter*, 847 F. App'x 694, 697–98 (11th Cir. 2021). Not every "malevolent touch" by a prison guard amounts to excessive force, but "a de minimis use of force

is cognizable under the Eighth Amendment if it is repugnant to the conscience of mankind." *Id.* (internal quotations omitted).

The Eleventh Circuit declined to find excessive force under similar facts. In *Johnson*, an inmate alleged a corrections officer kicked a metal tray door on his hand in an attempt to break his finger. 206 F. App'x at 881. The plaintiff's finger was cut, and he was given Motrin, a bandage, and a tetanus shot. *Id.* at 882. The inmate made many sick call requests and received treatment for pain for more than six months following the incident. *Id.* The district court entered summary judgment in favor of the officer, and the Eleventh Circuit affirmed. *Id.* at 884. The court concluded the evidence did not support a finding that the officer acted maliciously or sadistically because: (1) the plaintiff's injury was superficial and required only minimal treatment; (2) the officer immediately reported the incident and quickly escorted the plaintiff to the health unit for treatment; (3) the plaintiff did not claim the officer used threatening or abusive language in applying force; (4) the plaintiff was not stunned or beaten in the incident and did not need treatment at an off-site hospital; and (5) the officer did not repeatedly seek to harm the plaintiff or render him unconscious.

Here, while the parties agree Harrison closed Walker's pinky finger in the library door, they dispute whether Harrison specifically warned Walker prior to closing the library door. The court must consider (1) whether Walker's injury—a

fractured pinky—was sufficiently serious to violate the Eighth Amendment, and (2) whether there is evidence to support a finding that Harrison "maliciously and sadistically" closed the door on Walker's finger to inflict harm.

### 1.   Objective prong

The objective component examines whether the alleged wrongdoing was "objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *see also Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010) (prisoner must make an objective showing of a deprivation or injury that is sufficiently serious to constitute a denial of the minimal civilized measure of life's necessities); *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006) ("an injury can be 'objectively, sufficiently serious' [to constitute a constitutional violation] only if there is more than de minimus injury."). Where there has been a de minimis use of force, the Eighth Amendment will not provide relief unless the force "is repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10.

In *Johnson*, the plaintiff's hand was not fractured, but he complained of pain for many months. Here, the tip of Walker's pinky finger was fractured, rather than simply cut; however, his treatment was limited to acetaminophen and a week of follow up care. There is no evidence Walker complained of pain or sought further

treatment following his May 1, 2019 x-ray.[5] While a fracture is seemingly more serious than the *Johnson* inmate's cut finger, Walker's injury required minimal treatment, and there are no records or other allegations that Walker sought additional care. The undersigned questions whether Walker's injury is objectively serious enough to rise to an Eighth Amendment violation but for purposes of summary judgment will assume that force resulting in a bone fracture meets this standard.

### 2.   Subjective Prong

The subjective component asks whether the prison official acted with a sufficiently culpable state of mind—a plaintiff must show the prison official "maliciously and sadistically" used force for the purpose of causing harm. *Id.* Force is subjectively legitimate in a custodial setting when it is applied "in a good-faith effort to maintain or restore discipline [and not] maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6; *see also Johnson*, 206 F. App'x at 883. The court considers five factors in deciding whether force was used "maliciously and sadistically" for the purpose of causing harm: (1) the extent of the injury; (2) the need to use force; (3) the relationship between the need for force and the amount of force used; (4) any efforts made to lessen the severity of a forceful

---

[5] By contrast, there are many records of Walker complaining of pain in his other hand, related to a previously dismissed claim that working in the prison dish room resulted in "trigger finger," which ultimately required Walker to undergo surgery. (*See* Doc. 9 at 15).

response; and (5) the threat reasonably perceived by the official. *Johnson*, 206 F. App'x at 883.

Generally, "[a] prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)). Courts must give "a wide range of deference to prison officials acting to preserve discipline and security . . . ." *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). Neither a judge nor a jury may "freely substitute their judgment for that of [prison] officials who have made a considered choice." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

Like in *Johnson*, the evidence here does not support a conclusion that Harrison's conduct was "malicious and sadistic." First, the extent of Walker's injury does not support a finding that Harrison maliciously or sadistically used force. While the injury may be considered more serious than the plaintiff's injury in *Johnson*, it was treated with non-prescription pain medication, and there is no evidence Walker sought treatment or further complained of pain after the x-ray two days after the incident.

Second, Walker agrees that a lockdown of the hallway had been announced, but the library door remained open. He does not argue there was no need to close the door to the library or allege that Harrison closed the library door for a purpose other than securing the hallway following the lockdown announcement. Under these circumstances, Harrison was authorized to use some measure of force to secure the hallway to transport inmates. There is also no suggestion that Harrison used more force than was required to secure the hallway. While Harrison arguably could have waited to see if Walker moved from the door or given Walker a specific warning before closing the door,[6] there is simply no evidence to support a finding that Harrison acted "maliciously and sadistically for the very purpose of causing harm" rather than to secure the hallway to transport inmates.

Other factors considered by the court in *Johnson* also support the conclusion that Harrison did not act maliciously or sadistically. There is no evidence, or even allegation, Harrison used threatening or abusive language during this incident; Walker's real complaint is that Harrison reportedly said nothing at all to Walker before closing the door. Walker immediately reported the injury and received prompt examination and treatment for his injury. Walker was not stunned or beaten during

---

[6] According to Harrison, he did specifically instruct Walker to move out of the doorway. (Doc. 23-4). However, because Walker disputes this, the court accepts Walker's version of events as true for purposes of summary judgment.

the incident, and there is no suggestion Harrison sought to repeatedly harm Walker. Instead, this was a single incident resulting in a relatively minor injury.

The totality of the circumstances leads to a single conclusion—after an announced lockdown, Harrison closed the library door to secure the hallway to transport inmates. The court cannot conclude Walker has presented evidence that might "support a reliable inference" Harrison wantonly inflicted pain by shutting the library door to lock down the hallway. At most, the evidence demonstrates Harrison acted negligently by not giving Walker a specific warning to remove his hand from the door before shutting it. But Walker must show more than negligence; he must produce evidence that "goes beyond a mere dispute over the reasonableness of the force used and [instead] supports a reliable inference of *wantonness* in the infliction of pain.'" *See Stallworth*, 578 F. App'x at 953 (emphasis added). He has not done so. Accordingly, the undersigned recommends the court grant summary judgment in favor of Harrison on Walker's excessive force claim.

### B. Conditions of Confinement

Walker seeks both money damages and injunctive relief for the allegedly unconstitutional conditions of confinement at Donaldson. He names Commissioner Dunn and Warden Peters as defendants in their official capacity only, while Givens is named in both her individual and official capacity. (Doc. 1 at 11). Walker's claims for damages against all defendants in their official capacities were previously

dismissed as barred by sovereign immunity; however, his official capacity claims for injunctive relief against Dunn, Peters, and Givens remain pending, as do his claims for money damages against Givens in her individual capacity.

Walker, however, has been transferred from Donaldson since filing this lawsuit. Because of his transfer, the court can no longer award him injunctive relief. *See Owens v. Centurion Med.*, 778 F. App'x 754, 758 (11th Cir. 2019) (observing that "a prisoner's transfer . . . from a correctional facility generally will moot his claims for injunctive relief"); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985)) ("Past exposure to illegal conduct does not constitute a present case or controversy involving injunctive relief if unaccompanied by any continuing, present adverse effects."). Because Walker no longer resides at Donaldson, his request for injunctive relief is moot.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). To establish an Eighth Amendment violation, Walker must prove three elements: (1) a condition of confinement that inflicted unnecessary pain or suffering, (2) Givens's "deliberate indifference" to that condition, and (3) causation. *See LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993). Whether a particular condition of confinement constitutes cruel and unusual punishment is an objective inquiry; whether prison

officials were deliberately indifferent to that condition is a subjective inquiry. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

Prison conditions violate the Eighth Amendment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). While prison officials must furnish prisoners with "adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates,'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)), the Constitution "does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349. "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347. Therefore, extreme deprivations are required to prove a conditions of confinement claim under the Eighth Amendment. *See Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

Depriving an inmate of "the minimal civilized measure of life's necessities" can constitute cruel and unusual punishment. *Rhodes*, 452 U.S. at 347. But the deprivation must be of a "single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson*, 501 U.S. at 304. "Nothing so amorphous as 'overall

conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305. In *Wilson*, the Supreme Court rejected the argument that a district court must consider each allegedly unconstitutional condition "as a part of the overall conditions challenged." *Id.* at 304 (internal quotation marks omitted). The Court explained that conditions of confinement should instead be considered in tandem when, taken together, they deprive a prisoner of a "single, identifiable human need." *Id.*

Walker must show more than the presence of unconstitutional conditions. He must also demonstrate Givens was deliberately indifferent to those conditions—in other words, he must submit evidence that shows Givens "knowingly or recklessly disregard[ed his] basic needs." *See LaMarca*, 995 F.2d at 1535. To meet this standard, Walker must show Givens knew of the infirm condition and had the means to cure it, "so that a conscious, culpable refusal to prevent the harm can be inferred from [Givens's] failure to prevent it." *See id.* at 1536.

As discussed further below, most of the conditions of confinement Walker identifies do not meet the objective prong and therefore do not state an Eighth Amendment violation. Even where his complaints might meet the objective prong, Walker has not submitted evidence to support a finding that Givens, in her individual capacity, was deliberately indifferent to the conditions at Donaldson.

### 1.    Overcrowding and Staffing Shortages

Overcrowding, standing alone, does not violate the Constitution; rather, courts must consider the impact of overcrowding on a prison's ability to provide adequate care. *See, e.g., Rhodes*, 452 U.S. at 347–49 (holding "double celling" did not violate Eight Amendment where it did not lead to deprivations of essential food, medical care, or sanitation or increase violence among inmates); *Saunders v. Sheriff of Brevard Cnty.*, 735 F. App'x 559, 565 (11th Cir. 2018) (recognizing that in assessing a claim based on overcrowding a court must consider the impact of the overpopulation on the prison's ability to provide necessities such as food, medical care, and sanitation). Likewise, "there is nothing inherently wrong with having only a few staff members supervise inmates." *Laube v. Haley*, 234 F. Supp. 2d 1227, 1245 (M.D. Ala. 2002). Donaldson may be overcrowded and understaffed, but Walker must show these conditions deprive him of a single, identifiable need.

Walker refers to the DOJ Report to suggest the overcrowding and understaffing results in a violent atmosphere at Donaldson. To be sure, the DOJ Report describes a troubling situation throughout Alabama's prison system and substantial problems at Donaldson. However, the first page of the DOJ Report states:

> The Department [of Justice] does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Notice Letter ("Notice") should be construed as such. Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations.

*See* DOJ Report at 1 (emphasis added). Also, the incidents of violence described within the DOJ Report reference no dates and are anonymized. Finally, while the DOJ Report states that "evidence suggests some ADOC officials are deliberately indifferent to the risk of harm," the DOJ did not identify Givens—who was not assigned to Donaldson until after the report was issued—as an official who was aware of and indifferent to the conditions at Donaldson.[7] For these reasons, the court questions whether it can properly consider the DOJ Report as evidence, notwithstanding Givens's explicit consent to do so.

Even assuming Givens's consent is an admission that Donaldson is overcrowded and understaffed, Walker must also demonstrate Givens recklessly disregarded this threat. He does not dispute Givens's testimony that ADOC has prioritized recruitment and hiring. Neither has he introduced any evidence that Givens had the individual ability to cure overcrowding and understaffing. In the absence of that sort of evidence, there is nothing from which a jury could conclude Givens consciously and culpably refused to prevent the harms presented by overcrowding and understaffing. A prison official "cannot be deliberately indifferent unless [s]he knows of, but disregards, an appropriate and sufficient alternative." *See LaMarca*, 995 F.2d at 1536.

---

[7] To be clear, the DOJ Report does not identify any one indifferent individual.

Fewer inmates and additional staff might help to provide a safer environment for Donaldson's inmates. But Walker's lawsuit seeks money damages from Givens, individually. To survive summary judgment, he must provide at least some evidence to show Givens had the ability to correct the overcrowding and understaffing but refused to do so. He has not met this burden.

### 2.    Excessive Heat and Lack of Ventilation

The Eleventh Circuit has previously rejected an inmate's complaints about excessive summer temperatures due to inadequate ventilation. *See Chandler*, 379 F.3d at 1298. In *Chandler*, the district court found temperatures that sometimes exceeded 90 degrees in July and August did not violate the Eighth Amendment. *Id.* at 1297. The Eleventh Circuit affirmed, stating "while no one would call the summertime temperatures at the Unit pleasant, the heat is not unconstitutionally excessive" and is "consistent with reasonable levels of comfort and slight discomfort which are to be expected in a residential setting in Florida in a building that is not air-conditioned." *Id.*

Walker's initial claim that the dorms lack water fountains and ice machines is troubling, as it suggests he was wholly deprived of water; however, Walker did not address Peters's testimony that even though the dorms lack water fountains and ice machines, ice chests are provided to each dorm and ice calls are held on each shift. Likewise, a claim that the buildings at Donaldson have no ventilation at all during

the summer might well rise to a constitutional violation, but here, Walker does not claim Donaldson has a complete lack of ventilation and cooling. Instead, he complains the fans do not adequately cool the prison buildings. Given the Eleventh Circuit's holding in *Chandler*, however, this falls short of the "extreme deprivation" needed to demonstrate an Eighth Amendment violation. Moreover, while Givens's affidavit demonstrates she had actual knowledge of the ventilation issues, it also demonstrates that when equipment breaks down, maintenance personnel and/or ADOC's engineering department are called to repair the equipment. These steps may not fully resolve the ventilation issues or result in a comfortable summer environment, but they prevent a finding of deliberate indifference.

### 3.   Pests and Rodents

Walker's allegations concerning pests and rodents are unpleasant and objectionable, but they do not state a claim for an Eighth Amendment violation because they "fall short of the 'extreme deprivations' necessary to properly state a claim for relief for unconstitutional conditions of confinement." *See Adams v. Ivey*, No. 2:19-CV-01063-LCB-JHE, 2021 WL 711482, at *5 (N.D. Ala. Feb. 1, 2021), *report and recommendation adopted,* 2021 WL 690082 (N.D. Ala. Feb. 23, 2021); *see also Raines v. Caldwell*, No. 2:17-CV-00974-RDP-JEO, 2018 WL 3371917, at *4 (N.D. Ala. June 8, 2018), *report and recommendation adopted,* 2018 WL 3368962 (N.D. Ala. July 10, 2018) ("The plaintiff's claim that spiders, flies, ants

and other vermin entered his cell, without more, does not establish exposure to an inhumane condition of confinement. He does not allege any serious risk to his health."); *Brown v. Withrow*, 985 F.2d 559 (6th Cir. 1993) (presence of rats, roaches, and ants in a cell is not below the constitutional standard).

In addition, Walker does not dispute that a pest control company sprays weekly and sets bait traps at Donaldson. (Doc. 23-3 at 2). Even if not fully effective to control pests at Donaldson, this is a reasonable strategy to address the issue and forecloses a finding of deliberate indifference.

### 4.    Lack of Recreation

Walker's complaints regarding a lack of recreation suffer for similar reasons. Walker does not allege he has been harmed by limited exercise, nor does he claim he has been prevented from exercising in his cell. Instead, he complains inmates at Donaldson do not have anything to do, which he believes contributes to a substantial risk of fights and assaults. As a legal matter, Walker does not have a constitutional right to daily outdoor exercise or recreation. *See Anthony v. Warden*, 823 F. App'x 703, 707 (11th Cir. 2020) (holding the denial of outdoor exercise does not violate the Eighth Amendment when an inmate did not allege "he was prevented from exercising in his cell"); *Adams*, 2021 WL 711482 at *5.

Further, Walker does not dispute Givens's testimony that security concerns at Donaldson limit the recreational activities available at the facility. The Eleventh

Circuit has held that even a complete denial of outdoor exercise does not violate the Eighth Amendment where there is "penological justification." *See Bass v. Perrin*, 170 F.3d 1312, 1316–17 (11th Cir. 1999). Nor does Walker dispute Givens's testimony that an additional trade program has been added to Donaldson since her assignment there. Even if a denial of recreation was a recognized Eighth Amendment violation, Givens has taken steps to provide recreational opportunities. Therefore, Walker has not presented evidence demonstrating Givens's deliberate indifference.

### 5.   General Uncleanliness and Disrepair

Walker's complaints about Donaldson's uncleanliness generally concern the facility's poor condition. For example, he complains about inadequate lighting, a crumbling ceiling, and a dirty kitchen. Givens agrees Donaldson needs maintenance and states that the Engineer Division of ADOC is working to address these issues. (Doc. 23-1 at 3). Nevertheless, Walker has not pointed the court to any precedent holding these sorts of complaints amount to an "unquestioned and serious deprivation of basic human needs." *See Rhodes*, 452 U.S. at 347. This district has held that claims of mildew in the shower, brown sink water, and a collapsed shower drain do not rise to a level that violates the Eighth Amendment. *See Raines*, 2018 WL 3371917, at *4 (collecting cases holding that a general lack of facility cleanliness, without more, does not violate the Eight Amendment).

Sanitation issues that have previously been found to violate the Eighth Amendment typically involve prolonged contact with or proximity to human waste. *See, e.g., Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015) (finding Eighth Amendment violation where inmate was forced to defecate into his jumpsuit and sit in his own feces for two days and collecting cases). The claim that comes closest is Walker's complaint about the new toilet system with a time-controlled flushing mechanism that "forces the men in the blocks to live in close confines with their own human waste." But courts have previously found this sort of system does not present constitutional concerns. *See, e.g., Capers v. Hetzel*, No. 2:12-CV-708-WHA, 2012 WL 6632395 (M.D. Ala. Aug. 27, 2012), *report and recommendation adopted,* 2012 WL 6632287 (M.D. Ala. Dec. 19, 2012) (granting summary judgment where toilets were set to flush automatically every two hours); *Scaff-Martinez v. Reese*, No. 1:10-CV-00549-CLS, 2012 WL 6754889 (N.D. Ala. Aug. 31, 2012), *report and recommendation adopted,* 2012 WL 6754893 (N.D. Ala. Dec. 27, 2012) (finding no violation of clearly established law where toilet flushing is controlled by guards, resulting in delays of up to two hours).

Even assuming Walker has stated an Eighth Amendment violation for sanitation issues, he has not explained how Givens has the individual ability to cure these problems. He does not contest Givens's testimony that maintenance or ADOC's engineering department is contacted when needed to address equipment

breakdowns, nor does he dispute that cleaning supplies are distributed to inmates. Like his other complaints about the conditions at Donaldson, Walker has not produced any evidence that would support a finding Givens consciously and culpably refused to prevent or cure these conditions. *See LaMarca*, 995 F.2d at 1536.

## V.   Recommendation

For these reasons, the undersigned **RECOMMENDS** the court **GRANT** the defendants' motion for summary judgment.

## VI.   Notice of Right to Object

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days.** The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify in whole or in part the Magistrate Judge's findings of fact and recommendations. The District Judge will conduct a hearing if required by law and may exercise discretion to conduct a hearing or otherwise receive additional evidence. Otherwise, the District Judge may consider the record developed before the Magistrate Judge in making an independent determination of the relevant legal issues. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this 26th day of August, 2022.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE